1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DESERT SUN NET LLC, et al.,

        Plaintiffs,

    v.

COREY K. KEPLER, et al.,

        Defendants.

No. C06-1041P

ORDER ON PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTIVE
RELIEF

       This matter comes before the Court on Plaintiffs' motion for preliminary injunctive relief. (Dkt. No. 10). This case involves a dispute between Plaintiffs and their information technology (IT) provider. Through this motion, Plaintiffs request an order that would require Defendants: (1) to return or provide access to customer data; (2) to refrain from making further use of such customer data; and (3) to refrain from making threats to Plaintiffs' franchisees regarding the use or possession of customer data.

       Having reviewed the papers and pleadings filed by the parties and finding that oral argument is not necessary to decide this matter, the Court DENIES Plaintiffs' motion. Pursuant to Fed. R. Civ. P. 52(a), the Court's findings of fact and conclusions of law are set forth below.

ORDER - 1

**I.    Findings of Fact**

A.    The Parties

  1.  There are three Plaintiffs in this case: (1) Desert Sun Franchising LLC; (2) Desert Sun Net LLC; and (3) WCA Incorporated.  Plaintiffs are affiliated Washington companies.  According to Plaintiffs' complaint, Desert Sun Franchising LLC is a franchisor in the business of licensing to franchisees the right to open and maintain "Desert Sun" branded tanning salons.  Desert Sun Net LLC owns intellectual property, computer code, domain names, and other material associated with the Desert Sun group of companies' technical and Internet infrastructure.  WCA Incorporated owns several Desert Sun branded tanning salons, and manages the corporate operations for Desert Sun Net LLC and Desert Sun Franchising LLC.  For ease of reference, the three Plaintiffs may be referred to collectively as "Desert Sun."

  2.  There are five Defendants named in Plaintiffs' complaint:  (1) Corey K. Kepler; (2) CKK Consulting, Inc. ("CKK"); (3) Tanfrastructure, Inc. ("TFS"); (4) Alan W. Hopkins; and (5) TFS Group.  Defendants appear to be California residents or entities incorporated in California.  According to Defendants, CKK formerly provided IT services to tanning salons, and TFS currently provides such services.  Corey Kepler is the CEO/President of TFS and was formerly CEO of CKK.   Mr. Hopkins has not appeared in this matter and Plaintiffs do not seek preliminary injunctive relief against him.  Neither side explains the identity or role of the "TFS Group."

B.    Plaintiffs' Claims

  3.  Plaintiffs' complaint was filed on July 24, 2006 and raises fifteen claims.  Plaintiffs bring federal claims for violations of the Stored Wire and Electronic Communications and Transactional Records Access Act (18 U.S.C. § 2701 et seq.) and violations of the Electronic Communications Privacy Act (18 U.S.C. § 2510 et seq.).  Plaintiffs also seek declaratory relief under the federal Declaratory Judgment Act.  Plaintiffs' state-law claims include claims for breach of contract, tortious interference, fraud, unfair business practices, unjust enrichment, constructive trust,

ORDER - 2

1   civil extortion, misappropriation of trade secrets, invasion of privacy, breach of sales contract under

2   the UCC, "piercing of the corporate veils," and violations of the uniform fraudulent transfer act.

3   Although Plaintiffs' complaint raises fifteen claims, their motion for preliminary injunctive relief is

4   based on only two claims: (1) misappropriation of trade secrets; and (2) tortious interference.

5   C.     Events Leading to Litigation

6          4.      In 2004, CKK and Mr. Kepler began providing IT services to Desert Sun.  Plaintiffs

7   state that they engaged Mr. Kepler to host Plaintiffs' "customer data" (a term that Plaintiffs use to

8   refer to customer names, addresses, phone numbers, email addresses, purchase and activity histories,

9   and tanning package purchases) using the "SalonTouch" database and to make customer data available

10  to Desert Sun stores over a network.  Similarly, Defendants state that Desert Sun and CKK agreed in

11  or about December 2004 that Desert Sun would pay CKK a monthly fee to provide database hosting

12  services for each salon owned by Desert Sun.  There are no written copies of any 2004 agreements in

13  the record.  It appears that many of the dealings between the parties were through verbal agreements

14  rather than written contracts.  See, e.g., Dkt. No. 11 at ¶ 10 (noting that Mr. Kepler "entered into

15  several verbal agreements to provide services to Plaintiffs").

16         5.      Although Plaintiff WCA Incorporated owns several "corporate" tanning salons that

17  operate under the Desert Sun name, most of the salons that operate under the "Desert Sun" name are

18  either franchisees or licensees of Desert Sun and are not owned by Plaintiffs.  None of the franchisees

19  or licensees are named parties in this action.  The contractual relationships between Plaintiffs and their

20  franchisees or licensees are not clear from the record.  Plaintiffs have not offered evidence (such as a

21  contract between themselves and a franchisee or licensee) indicating that Plaintiffs own the customer

22  data of its franchisees or licensees.

23         6.      According to Defendants, CKK began offering to provide computer hardware,

24  software, and networking services to Desert Sun licensees in or about January 2005.  Defendants also

25  maintain that in or about February 2005, CKK began entering into IT service agreements directly with

ORDER - 3

1   Desert Sun licensees and that none of the Plaintiffs were parties to those agreements.  Plaintiffs do not
2   dispute these assertions.

3         7.      According to Defendants, TFS acquired all of CKK's assets and assumed CKK's
4   agreements with Desert Sun and Desert Sun's licensees in or about September 2005.

5         8.      Defendants maintain that their agreements with Desert Sun and its licensees provided
6   that upon termination of CKK/TFS's services, each salon would be required to pay an "extraction and
7   migration" fee to obtain its database.  In his declaration, Mr. Kepler states that this fee "covers the
8   cost of 'cleansing' CKK's proprietary source code and database structural changes from the salon's
9   data and compiling archived customer data into one deliverable database."  (Dkt. No. 34 at ¶ 13).

10        9.      Aside from Mr. Kepler's declaration, there is little documentary evidence regarding the
11  "extraction and migration" fees that CKK or TFS were authorized to charge Desert Sun or its
12  licensees/franchisees.  However, Plaintiffs have offered an example of an August 25, 2005 contract
13  between TFS and a Desert Sun licensee in Factoria, Washington.  (Dkt. No. 11, Ex. B).  This contract
14  is titled "Agreement for Services and Products - Desert Sun Corporate Licensees."  Exhibit A to the
15  contract provides in bold letters: "There is a data migration labor expense to discontinue use of the
16  corporate network and move to a stand alone salon.  This labor expense depends on the amount of
17  work required to extract your client and salon records from the corporate network."  Id. at 7.

18        10.      Defendants maintain that all of TFS's agreements with Desert Sun franchisees
19  incorporate "TFSLiNK Network Policies."  Defendants have provided a print-out of the "TFSLiNK
20  Network Policies" as they were posted online as of August 25, 2006.  (Dkt. No. 34, Ex. 1).  Among
21  other things, the policies provide that the customer "owns the raw data which may reside on TFS's
22  servers, but agrees that data which is to be removed is subject to a migration or extraction fee which is
23  set by TFS.  Extraction and Migration fees are determined by the complexity of the data, time residing
24  on the server, and/or other criteria set by company."  As Plaintiffs note, Defendants have not offered
25  copies of the "TFSLiNK Network Policies" that were in place prior to August 2006.

ORDER - 4

11.     From the record, it is apparent that the relationship between Desert Sun and TFS worsened in May 2006.  Mr. Kepler and TFS's Technical Services Director Moises Jimenez have both described a meeting in Seattle on May 31, 2006 between representatives from Plaintiffs and Defendants in which Maximo Ansola, the CEO of Plaintiff WCA Incorporated, stated that he would "destroy" TFS.  See Dkt. Nos. 34 at ¶18, Dkt. No. 32 at ¶ 4.

12.     Defendants have offered evidence that following this incident, Desert Sun and TFS representatives discussed proposals for continuing to work together, including a proposed plan in which Desert Sun would pay TFS a one-time fee of $500,000 for the release of TFS intellectual property rights and for Desert Sun's exclusive rights to TFS's services in Washington, Oregon, Idaho, and Montana.  See Dkt. No. 34 at ¶18 and Ex. 5.  However, the parties were not able to reach an agreement on this proposal.

13.     In June 2006, Mr. Kepler and Mr. Ansola attempted to negotiate a termination agreement.  Mr. Kepler has provided copies of e-mails between him and Mr. Ansola from June 21, 2006, regarding such negotiations.  (Dkt. No. 34, Exs. 6 & 8).  According to Mr. Kepler, he and Mr. Ansola met on June 23, 2006 in Santa Monica, California.  Mr. Kepler states that at this meeting:

> We agreed . . . that we would terminate all of the agreements between Desert Sun and TFS for a payment of $180,000, payable in three installments, and that TFS would immediately begin to transition Desert Sun to another IT provider.  We shook hands on the agreement, which Mr. Ansola stated was fair and equitable.

(Dkt. No. 34, ¶ 20).  Mr. Kepler indicates that he subsequently agreed to lower the payment from $180,000 to $160,000 and that Mr. Ansola asked Mr. Kepler to have TFS's attorney prepare a written agreement.  Id.  Plaintiffs have not disputed these contentions.

14.     Mr. Kepler's statements regarding the verbal agreement that he reached with Mr. Ansola is supported by TFS Technical Services Director Moises Jimenez, who recounted a similar agreement.  Mr. Jimenez states:

> On or about June 30, 2006, I participated with Mr. Kepler in a telephone conference call with Mr. Ansola and Ms. Kaveny of Desert Sun.  During the phone conversation, Mr. Ansola and

1
2
3
4

Ms. Kaveny affirmed a verbal agreement that Mr. Ansola had reached with Mr. Kepler regarding the termination of TFS's services for Desert Sun.  Specifically, they agreed that Desert Sun would pay TFS a total of $160,000 and that, in exchange, TFS would release Desert Sun and its licensees and franchisees from the remaining terms of their agreements with TFS, TFS would transition all of Desert Sun's data (and the data of Desert Sun's licensees and franchisees, if they desired) to a retrievable account, relinquish control over Desert Sun's web-site domain name, and help Desert Sun's corporate office transaction to another IT provider.

5   (Dkt. No. 32 at ¶ 5).  Plaintiffs have not disputed Mr. Jimenez's contentions.

6        15.     In a declaration offered in support of Plaintiff's opening brief, Mr. Ansola states that

7   Defendants refused to release customer data in June 2006 unless Desert Sun agreed to pay Defendants

8   over $400,000.  (Dkt. No. 11 at ¶ 28).  Mr. Kepler disputes Mr. Ansola's contention.  It appears that

9   Mr. Ansola may be referring to discussions in early June 2006, and that he is not referring to the verbal

10  agreement that Mr. Ansola and Mr. Kepler reached later in the month regarding a termination

11  agreement that included a $160,000 payment.

12       16.     Mr. Kepler maintains that based on his belief that the parties had a firm agreement in

13  place, TFS transitioned all of Desert Sun's e-mails to a retrievable Desert Sun account, relinquished

14  control over Desert Sun's internet domain name, and helped Desert Sun's corporate office transition

15  to another IT provider.  (Dkt. No. 34 at ¶ 21).  Similarly, Mr. Jimenez states that "believing we had a

16  firm agreement in place, we . . . did everything we were required to do under the verbal agreement

17  other than extracting customer data from TFS's server." (Dkt. No. 32 at ¶ 5).  TFS's attorney drafted

18  a "Mutual Release and Termination Agreement" by mid-July 2006 that contained the terms of the

19  verbal agreement between Mr. Kepler and Mr. Ansona, other than the transition work that TFS had

20  already completed.  (Dkt. No. 34 at ¶ 21 & Ex. 9).

21       17.     Mr. Kepler asserts that Desert Sun "request[ed] that TFS provide Desert Sun with all

22  of the data belonging to its franchisees and licensees as evidence of TFS's 'good faith.'" (Dkt. No. 34

23  at ¶ 21).  Mr. Kepler states that after TFS rejected this request, Desert Sun filed this lawsuit on July

24  24, 2006.  Id.  Plaintiffs do not dispute these contentions.

25

18.     Defendants have accused Plaintiffs or their agents of "breaking into" TFS's server on or about July 24, 2006, the day this lawsuit was filed.  Specifically, Mr. Kepler asserts that on or about July 24, 2006, Desert Sun or its agents:

> [B]roke into TFS's network server through a salon's mini-server and extracted the entire database of Desert Sun, its corporate stores, and its licensees and franchisees.  The database included customer records and sales histories of salons owned by licensees and franchisees.  The information extracted also included all of TFS's proprietary source code.

Id. ¶ 22.  Plaintiffs have not offered a declaration that specifically disputes this contention, although they characterize the accusation as "reckless."

19.     On July 28, 2006, Mr. Kepler sent the following e-mail to Desert Sun franchisees and licensees:

> Dear Connected Owners:
>
> As you may be aware we have been negotiating in good faith with Desert Sun and Mr. Ansola for the past few months on demands they've made to obtain our web reports and tools and prohibit us from working with other tanning salons.
>
> I've spoken with most of you and explained that under no circumstances would we be terminating your service and that we would operate under the status quo regardless of what happened with Desert Sun and Mr. Ansola.
>
> It is my duty to inform you that our network security has been compromised by an internal entity (or operating under the direction of an internal entity) of Desert Sun which has stolen the entire Desert Sun database to include all franchisees, licensees, and corporate owned locations.  This database contains all of your customer records, sales histories, and everything we have here.  This extraction was completed without our permission and outside of our standardized process.
>
> We have opened an investigation with the FBI this week on this theft and provided specific details of this act.  We have provided the FBI with contact information for all stores.  We will assist in the prosecution of the culprits to the fullest extent of the law and will be asserting counterclaims against Desert Sun in its lawsuit against us.
>
> We have taken additional safeguards to prevent this from happening again and please know that we will continue to support you through this legal process they have started.
>
> In closing, although I cannot discuss the details of the case I will tell you that appearances and accusations are not always as they appear.  There is a lot more to this story which will be uncovered and will become known.  Look at your own experiences; talk with other vendors and stores.  Are things always as they are presented?

1    We look forward to this process, clearing our good name, and setting the record straight.

2  (Dkt. No. 11, Ex. E).

3    20.    The Court does not find Mr. Kepler's e-mail of July 28, 2006 to be a "threat" to Desert

4  Sun franchisees or licensees, as suggested by Plaintiffs.

5    21.    Plaintiffs also maintain that Mr. Kepler threatened Jay Pearson and Craig Pruss of

6  Soliel[1] & Co., a Desert Sun franchisee.  Mr. Pearson states that Mr. Kepler "said the FBI is actively

7  investigating Soliel & Co. regarding its use of Desert Sun Customer Data."  (Dkt. No. 12 at ¶ 11).

8  Mr. Pearson further states:

9        [Mr.] Kepler told me that I should expect that the FBI will show up at our Desert Sun location
         to investigate whether we were accessing the Customer Data. [Mr.] Kepler further threatened
10       that the FBI was be [sic] pursuing me personally and would show up at my home to investigate
         my personal use of Customer Data. [Mr.] Kepler even sent me an email with the FBI
11       investigation threat, a true and correct copy of which is attached as **Exhibit A** hereto.[2]  I took
         seriously [Mr.] Kepler's threats that "the FBI is watching" and I am worried that [Mr.] Kepler
12       will attempt to cause me injury if I provide Customer Data to Desert Sun corporate.

13  Id. at ¶ 12 (emphasis in original).  Mr. Pruss makes similar, although less detailed, accusations.  (Dkt.

14  No. 28 at ¶ 11).  Mr. Kepler denies Mr. Pearson's and Mr. Bruss's allegations.  (Dkt. No. 34 at ¶ 23).

15  The Court cannot resolve this factual dispute on the record before it.

16    22.    There is little evidence in the record to support Mr. Ansola's vague and conclusory

17  accusations that Defendants misused Desert Sun's trade secrets in marketing their services.  Mr.

18  Ansola maintains:

19       While providing IT Services to Desert Sun, Defendants used Desert Sun's trade secrets to
         market [Mr.] Kepler's goods and services to other tanning salons.  I observed that Defendants'
20       website published reports and other essential components of Desert Sun's confidential
         proprietary business model.

21

22  _____

23    [1]  The Court spells the word "Soliel" as it was presented in these declarations, although the
    word is typically spelled "Soleil."

24    [2]  As Defendants noted in their opposition brief, there is no "Exhibit A" attached to Mr.
    Pearson's declaration.  The Court presumes that the e-mail Mr. Pearson is referring to is the July 28,
25  2006 e-mail from Corey Kepler described earlier.

1   (Dkt. No. 11 at ¶ 23).  By way of example, Mr. Ansola maintains that TFS's website "represents that

2   Defendants can provide reports (called "the TFS Snapshot"), which are plainly knock-offs of the

3   Desert Sun reports."  Id. at ¶ 24.  However, Plaintiffs did not offer copies of the "TFS Snapshot" or

4   examples of "Desert Sun reports," nor have Plaintiffs provided any comprehensible description of

5   Desert Sun's "proprietary business model."

6          23.     Plaintiffs have not offered evidence that Defendants have used or disclosed any

7   customer data of Plaintiffs or their franchisees/licensees, nor have Plaintiffs offered evidence that

8   Defendants have threatened to use or disclose such data.

9          24.     Plaintiffs have not offered evidence that Defendants' conduct has caused the breach or

10  termination of any contracts between Plaintiffs and a third party.  In addition, Plaintiffs have not

11  offered persuasive evidence that Defendants' conduct has caused the breach or termination of

12  Plaintiffs' business expectancies.

13         25.     Plaintiffs have offered virtually identical declarations from a number of Desert Sun

14  franchisees.  Each of these declarations maintains that because the franchisee "does not have access to

15  the Customer Data, some of our customers are having – and will continue to have – bad customer

16  service experiences" and that this is "eroding the goodwill" of their business and "causing serious

17  harm" to their business reputations.  The Court gives little weight to such "cookie cutter" declarations

18  or to vague and conclusory assertions that some unidentified customers are having "bad customer

19  service experiences."

20

21                                  **II.    Conclusions of Law**

22  A.     Preliminary Injunction Standard

23         1.      Ordinarily, preliminary injunctive relief is warranted when the court determines: (1) the

24  moving party will suffer irreparable injury if relief is denied; (2) the moving party will likely prevail on

25  the merits at trial; (3) the balance of potential harm favors the moving party; and (4) in certain cases,

ORDER - 9

the public interest favors granting injunctive relief.  Textile Unlimited, Inc. v. A..BMH & Co., Inc., 240 F.3d 781, 786 (9th Cir. 2001).  In requesting a preliminary injunction, "a moving party must show either 'a combination of probable success on the merits and the possibility of irreparable harm' or 'serious questions going to the merits, the balance of hardships tipping sharply in its favor, and at least a fair chance of success on the merits.'"  Overstreet v. United Bhd. of Carpenters & Joiners of America, 409 F.3d 1199, 1207 (9th Cir. 2005).  These two formulations are not separate tests but represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases.  United States v. Odessa Union Warehouse Co-op, 833 F.2d 172, 174 (9th Cir. 1987).

2.     The Ninth Circuit has drawn a distinction between a "mandatory injunction" that seeks to compel the defendant to perform an affirmative act and a "prohibitory injunction" that seeks to preserve the status quo pending trial.  The Ninth Circuit has explained the distinction as follows:

> A prohibitory injunction preserves the status quo.  A mandatory injunction "'goes well beyond simply maintaining the status quo *pendente lite* [and] is particularly disfavored.'"  When a mandatory preliminary injunction is required, the district court should deny such relief "'unless the facts and law clearly favor the moving party.'"

Stanley v. Univ. of S. Cal., 13 F.3d 1313, 1320 (9th Cir. 1994) (internal citations omitted).  See also Dahl v. HEM Pharms. Corp., 7 F.3d 1399, 1403 (9th Cir. 1993) (noting that request for preliminary injunctive relief that would require affirmative conduct by defendant is "subject to heightened scrutiny and should not be issued unless the facts and law clearly favor the moving party").

3.     As one form of preliminary injunctive relief, Plaintiffs request that the Court order Defendants to "return" customer data to them (Dkt. No. 10 at 1) or to "grant Desert Sun or a neutral third part . . . access to" the customer data (Dkt. No. 38 at 1).  This appears to be a request for a form of mandatory injunctive relief.  See, e.g., LGS Architects, Inc. v. Concordia Homes of Nev., 434 F.3d 1150, 1158 (9th Cir. 2006) (holding that plaintiff's request for a preliminary injunction requiring defendant to return plaintiff's architectural plans was a request for mandatory injunctive relief).

1   However, the distinction between a prohibitory and mandatory injunction is not significant here

2   because the Court concludes that Plaintiffs are not entitled to a preliminary injunction even under the

3   less stringent standard for a prohibitory injunction.

4   B.      Claim for Misappropriation of Trade Secrets

5          4.      Plaintiffs claim that Defendants have misappropriated their trade secrets by withholding

6   Plaintiffs' customer data.  It is undisputed that some forms of customer data (e.g., customer lists) may

7   be regarded as a protectable trade secret under Washington law.  Plaintiffs also note that Washington

8   law expressly authorizes courts to enjoin the "actual or threatened" misappropriation of trade secrets

9   (RCW 19.108.020(1)), and provides that "[i]n appropriate circumstances, affirmative acts to protect a

10  trade secret may be compelled by court order."  RCW 19.108.020(3).

11         5.      Plaintiffs have not demonstrated that they are likely to succeed on their claim that

12  Defendants have misappropriated Plaintiffs' customer data, nor have they raised serious questions

13  going to the merits of this claim.  Washington's Uniform Trade Secrets Act defines "misappropriation"

14  as follows:

15         "Misappropriation" means:

16         (a)     Acquisition of a trade secret of another by a person who knows or has reason to know
                   that the trade secret was acquired by improper means; or
17
           (b)     Disclosure or use of a trade secret of another without express or implied consent by a
18                 person who:

19                 (i)     Used improper means to acquire knowledge of the trade secret; or
                   (ii)    At the time of disclosure or use, knew or had reason to know that his or her
20                         knowledge of the trade secret was . . . (B) acquired under circumstances giving
                           rise to a duty to maintain its secrecy or limits its use; or (C) derived from or
21                         through a person who owed a duty to the person seeking relief to maintain its
                           secrecy or limit its use . . . .
22
    RCW 19.108.010(2).  Plaintiffs have not offered evidence that Defendants acquired any of Plaintiffs'
23
    customer data by improper means.  Plaintiffs also have not offered evidence that Defendants have
24
    actually disclosed or used any of Plaintiffs' customer data, nor have they offered evidence that
25

Defendants have threatened to disclose or use such information.  Instead, Plaintiffs seem to suggest that they are afraid that Defendants will disclose or use the customer data because Defendants have supposedly misappropriated Plaintiffs' trade secrets in the past.  However, as noted earlier in Finding of Fact No. 22, the evidence that Plaintiffs have offered to support such allegations of prior misappropriation of trade secrets is vague and conclusory at best.

6.     Because Plaintiffs have not raised serious questions going to the merits of this claim and have not demonstrated a fair chance of success on this claim, the Court need not consider the remaining factors for preliminary injunctive relief with respect to this claim.

C.     Tortious Interference Claim

7.     Plaintiffs allege that Defendants have tortiously interfered with Plaintiffs' contractual relationships or business expectancies by: (1) refusing to provide access to the customer data; and (2) supposedly threatening Desert Sun's franchisees with an FBI investigation regarding the customer data.

8.     Under Washington law, a plaintiff bringing a claim for tortious interference with a contractual relationship or business expectancy must prove five elements:

(1)     The existence of a valid contractual relationship or business expectancy;

(2)     that defendants had knowledge of that relationship;

(3)     an intentional interference inducing or causing a breach or termination of the relationship or expectancy;

(4)     that defendants interfered for an improper purpose or used improper means; and

(5)     resultant damages.

Leingang v. Pierce County Med. Bureau, Inc., 131 Wn.2d 133, 156 (1997).

9.     Plaintiffs have not offered persuasive evidence that Defendants' withholding of access to customer data has caused any third parties to breach or terminate contractual relationships or business expectancies with Plaintiffs.  Although some of Plaintiffs' franchisees have asserted, in

ORDER - 12

1   virtually identical declarations, that customers are having "bad customer service experiences" because

2   the franchisees cannot access customer data, these vague and conclusory statements do not indicate

3   that the franchisees have lost customers or businesses.  In any case, the franchisees are not parties to

4   this action.

5        10.   Plaintiffs also have not offered convincing evidence that Defendants' withholding of the

6   customer data constitutes interference for an improper purpose or through improper means.  The

7   evidence before the Court indicates that Desert Sun and TFS reached a verbal agreement in late June

8   2006 in which Desert Sun would pay TFS $160,000 and TFS would provide for the transfer of

9   customer data.  It appears that Defendants are not providing access to the customer data because

10  Plaintiffs did not perform under the parties' agreement.  "Exercising in good faith one's legal interests

11  is not improper interference."  Leingang, 131 Wn.2d at 157.

12       11.   Because Plaintiffs have offered little evidence to support the third and fourth elements

13  of a tortious interference claim based on Defendants' refusal to provide access to the customer data,

14  the Court finds that Plaintiffs have not shown a fair chance of success on this claim, nor have they

15  raised serious questions going to the merits of this claim.

16       12.   Plaintiffs also have not raised serious questions going to the merits of their claim that

17  Defendants have tortiously interfered with Plaintiffs' contractual relationships or business expectancies

18  by allegedly threatening Desert Sun franchisees with an FBI investigation.  As noted earlier, the Court

19  does not regard Mr. Kepler's July 28, 2006 e-mail as a "threat" to Desert Sun franchisees and

20  licensees.  The question of whether Mr. Kepler made "threats" regarding FBI involvement to

21  franchisees Jay Pearson or Craig Pruss of Soliel & Company is disputed and cannot be resolved on the

22  present record.  In any event, Plaintiffs have not offered evidence that the alleged "threats" by Mr.

23  Kepler have caused Mr. Pearson, Mr. Bruss, or any other third party to breach or terminate any of

24  their contracts or business expectancies with Desert Sun.

25

ORDER - 13

1    13.    Because Plaintiffs have not raised serious questions going to the merits of their tortious

2  interference claims and have not demonstrated a fair chance of success on these claims, it is not

3  necessary to consider the remaining factors for preliminary injunctive relief with respect to these

4  claims.

5                                          **Conclusion**

6        Plaintiffs' motion for a preliminary injunctive relief is based on Plaintiffs' claims for

7  misappropriation of trade secrets and tortious interference.  On the limited record before the Court,

8  Plaintiffs have not raised serious questions going to the merits of these two claims, nor have they

9  demonstrated a fair chance of success on these claims.  Therefore, Plaintiffs' motion for a preliminary

10 injunction is DENIED.

11       The Clerk is directed to send copies of this order to all counsel of record.

12       Dated:   October 27, 2006

13

14                                      s/Marsha J. Pechman_____
                                        Marsha J. Pechman
15                                      United States District Judge

16

17

18

19

20

21

22

23

24

25

ORDER - 14